UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 00225

-------------------------------------------------------------------X

UNICORN TANKERS (INTERNATIONAL) LTD.,

                 Plaintiff,

     - against -

ONTARIO OIL & GAS LTD. of NIGERIA a/k/a
ONTARIO OIL & GAS LTD. a/k/a ONTARIO OIL
& GAS LIMITED a/k/a ONTARIO OIL AND GAS (NIG.)
LTD. a/k/a ONTARIOOILNG a/k/a ONTARIO OIL &
GAS (NG),

                 Defendant.

-------------------------------------------------------------------X

:    08 Civ. _____



## VERIFIED COMPLAINT

Plaintiff, UNICORN TANKERS (INTERNATIONAL) LTD. ("Plaintiff"), by and

through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against

the Defendant, ONTARIO OIL & GAS LTD. of NIGERIA a/k/a ONTARIO OIL & GAS LTD.

a/k/a ONTARIO OIL & GAS LIMITED a/k/a ONTARIO OIL AND GAS (NIG.) LTD. a/k/a

ONTARIOOILNG a/k/a ONTARIO OIL & GAS (NG), ("Defendant") alleges, upon information

and belief, as follows:

     1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

     2.     At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity organized and existing under the foreign law.

3.    Upon information and belief, Defendant was, and still is, a foreign corporation, or other business entity organized and existing under foreign law with an address in Nigeria.

4.    At all material times, Plaintiff was the Owner of the motor vessel "ORIBI" (hereinafter the "Vessel").

5.    By a charter party dated December 28, 2007, Plaintiff time-chartered the Vessel to Defendant for a period of three years.

6.    The charter party was based on the Shelltime 4 form and provided in paragraph 8 that charterers shall pay for the use of the Vessel at "USD 10,500 per day and pro rata for any part of a day, from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners." The charter party also included a purchase option, at clause 31, giving Defendant the right to purchase the Vessel at the end of the charter period at a price of US$9,300,000. *See Charter Party annexed hereto as Exhibit "1."*

7.    On or about January 8, 2008, Plaintiff notified Defendant that the Vessel was in all respects ready for delivery to Defendant pursuant to the terms of the charter party.

8.    However, disputes soon arose between the parties regarding Defendant's refusal to perform the charter under the terms agreed.

9.    Defendant instructed Plaintiff that it would not perform the charter as the rates specified in the charter party and the purchase option price were both too high.

10.    Defendant's statement that it would not perform under the charter party amounted to a repudiatory breach, and as a result, Plaintiff elected to terminate the charter party on January 9, 2008, reserving all of its rights to claim the damages and/or costs arising therefrom.

11.    By reason of the aforesaid repudiatory breach, Plaintiff has suffered loss and damages, including but limited to, loss of hire.

12.    Had Defendant not repudiated the charter party, the Vessel would have been employed for the full period of the charter party, i.e., 1095 days (three years) at an average daily rate of $10,500 per day, and Defendant would have paid a monthly communication and representation costs of $1,250.

13.    Although Plaintiff is now seeking to mitigate its damages, at this time, it has not re-chartered the Vessel. However, Plaintiff's best assessment of the market for a comparable 3 year charter with worldwide trading is US$8,500 per day.

14.    On this basis, Plaintiff's loss would be calculated as follows: ($10,500 - $8,500) per day x 1095 = $2,190,000.00.

15.    As a result of Defendant's repudiatory breach of charter party contract, as best as can now be estimated, Plaintiff has and/or will sustain damages in the principal amount of $2,190,000.00, exclusive of interest, arbitration costs and attorneys fees.

16.    Pursuant to the charter party, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply.

17.    Despite due demand, Defendant has failed and/or refused to pay the sums due and owing to Plaintiff.

18.    Thus, Plaintiff has commenced arbitration proceedings against Defendant on its claims.

19.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in proceedings subject to English Law. As best as can now be estimated, Plaintiff expects to recover the following amounts in the Final Arbitration Award(s):

| | | |
|---|---|---|
| A. | Principal claim: | $2,190,000.00 |
| B. | Interest on claims:<br>3 years at 6.5%, compounded quarterly | $467,362.60 |

| | | | |
|---|---|---|---|
| C. | Estimated attorneys' fees and expenses: | | $350,000.00 |
| D. | Estimated arbitration costs: | | $100,000.00 |

**Total**                                                              **$3,107,362.60**

20.     Plaintiff reserves its right to amend the complaint to include additional damages incurred as a result of Defendant's repudiatory breach of the charter party contract.

21.     The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

22.     The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.     That since the Defendant cannot be found within this District pursuant to

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue

an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment

pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also

pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels,

credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any

other funds held by any garnishee within the District which are due and owing to the Defendant,

in the amount **$3,107,362.60** calculated to date to secure the Plaintiff's claims, and that all

persons claiming any interest in the same be cited to appear and pursuant to Supplemental

Admiralty Rule B answer the matters alleged in the Complaint;

D.    That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court

E.    That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof;

F.    That this Court award Plaintiff its attorney's fees and costs of this action; and

G.    That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: January 10, 2008
       Southport, CT

The Plaintiff,
UNICORN TANKERS (INTERNATIONAL) LTD.

By: _____
Nancy R. Peterson (NP 2871)
Patrick F. Lennon (2162)
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170

(212) 490-6050 – phone
(212) 490-6070 – fax
nrp@lenmur.com
pfl@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut  )
                    )    ss.:    Town of Southport
County of Fairfield    )

    1.      My name is Nancy R. Peterson.

    2.      I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

    3.      I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

    4.      I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

    5.      The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

    6.      The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

    7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:       January 10, 2008
             Southport, CT

                                _____
                                  Nancy R. Peterson

EXHIBIT "1"

Code word for this Charter Party
" SHELLTIME 4"

Issued December 1984

# Time Charter Party
LONDON.

IT IS THIS DAY AGREED between Unicorn Tankers (International) Limited
of British Virgin Islands (hereinafter referred to as "Owners"), being owners of the motor tanker
good vessel called    OVM
(hereinafter referred to as "the vessel") described as per Clause 1 hereof and    ONTARIO OIL & GAS LTD
of    NIGERIA    (hereinafter referred to as "Charterers").

**Description Conditions of Vessel**

1.  At the date of delivery of the vessel under this charter
    (a) she shall be classed;
    (b) she shall be in every way fit to carry crude petroleum and/or its products, DPP, CPP, and all other cargoes in accordance with vessel's class, cargo tank coating and all charterers resistance lift, tanks, lines and oil's pumping capability, Grades always within vessels natural segregations.
    (c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in good and efficient state;
    (d) her tanks, valves and pipelines shall be oil-tight;
    (e) she shall be in every way fitted for burning
        at sea - fuel oil with a maximum viscosity of 150 cst RH15 25 Centistokes at 50 degrees Centigrade/any commercial grade of fuel oil ("ACGFO") for main propulsion, marine diesel oil/ACGFO for auxiliaries.
    In port - marine diesel oil/ACGFO for auxiliaries;
    (f) she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;
    (g) she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;
    (h) she shall comply with the description in Form B appended hereto, provided however that if there is any conflict between the provisions of Form B and any other provision, including this Clause 1 of this charter such other provision shall govern.

**Shipboard Personnel and their Duties**

2.  (a)  At the date of delivery of the vessel under this charter
    (i) she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;
    (ii) all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the laws of the flag state;
    (iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention of Standards of Training, Certification and Watch Keeping for Seafarers, 1978;
    (iv) there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge there from to be carried out quickly and efficiently.
    (b) Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers,
        (i) prosecute all voyages with the utmost dispatch;
        (ii) render all customary assistance, and including the connection and disconnecting of cargo/ballast hoses if required. Ships crew carry out this task as a servant of the Charterer and Charterer to remain responsible for condition of hose and all fixing. Ship not to be held responsible for any failure of hose, gaskets, bolts, etc.
        (iii) load and discharge cargo as quickly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

**Duty to Maintain**

3.  (i) Throughout the charter service Owners shall, whenever the passage of time, wear and tear of any event (whether or not covering under Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.
    (ii) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clause 1,2(a), or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.
    Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.
    (iii) If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in writing and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.
    Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights under Clause 21 hereof)

Period Trading Limits

4.  Owners agree to let and Charterers agree to hire the vessel for a period of 3 years commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular DPP, CPP, and all other cargoes in accordance with vessel's clean, cargo tank coating which Charterers reinstate the, tanks, lines and vsl's pumping capability. Grades always within vessels natural segregations in trading area and coastwise, as Charterers shall direct, subject to the limits of the current British Insitute Warranties, and any subsequent amendments thereof. Notwithstanding the foregoing, but subject to Clause 35, Charterers may order the vessel to ice-bound waters or Interline West Africa but worldwide excluding war areas/zones; and an embargoed countries, as well as Israel, Iraq, Iran, Turkish occupied Cyprus, Albania, North Korea, Cuba, Haiti and always within IwL, to any ports elsewhere outside such limits provided the Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order.

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where the can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.

The vessel shall be delivered by Owners at a port one safe berth in Durban South Africa at Owners' option and redelivered to Owners at a port in one safe berth in Durban South Africa at Charterers' option.

Laydays/ Cancelling

5.  The vessel shall not be delivered before 20th December 2007    and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before 20th January 2008. Owners to give 15/10/5GDN days notice to delivery.

Owners to Provide

6.  Owners undertake to provide and to pay for all provisions, wages, and shipping and disbursing fees and all other expenses of the master, officers and crew also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water except fresh water used for cleaning of tanks, for all dry docking, overhaul, maintenance and repairs to the vessel, and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on hire.

Charterers to Provide

7.  Charterers shall provide and pay for all fuel, towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes to which the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners.

Rate of Hire

8.  Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of USD38,500    per day, and pro rata for any part of a day, from the time and date of delivery (local time) until the time and date of her redelivery (local time) to Owners. Charterers to pay owners USD1250 per month for commercial ops. Costs of gratuities demanded by authorities in the trading area to be reimbursed to owners.

Payment of Hire

9.  Subject to Clause 9 (HI), payment of hire shall be made in immediately available funds to Account    Pay to    :    American Express Bank Limited New York, NY

SWIFT Code :   AEIBUS33
Account      :   The Royal Bank of Scotland (RBOSGB2L)
Account No.  :   000260123
CHIPS ABA  :   0159
Fed Wire ABA  :   1240-2388-9

For further credit to :   Unicorn Tankers (International) Limited
Account Id:   UNTAN-USDA
IBAN: GB03 RBOS 1663 6000 2360 38
IBAN BIC: RBOS GB 3L
in    per calendar month in US Dollars advance, less
    (i)    any hire paid which Charterers reasonably estimate to relate to off-hire periods, and
    (ii)    any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof; and
    (iii)    any amounts due or reasonably estimated to become due to Charterers under Clause 3 (ii) or 24 hereof,
any such adjustments to be made at the due date for the next monthly payment after the firsts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.

In default of such proper and timely payment,

(b) Owners shall notify Charterers of such default, and Charterers shall within seven days of receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise;
and

(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York, at 12:00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360-day year of twelve 30-day months, compounded semi-annually.

**Space Available to Charterers**
10   The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed 150 metric tons at any time during the charter period.

**Overtime**
11 - Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred as a result of complying with the requests of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank-cleaning

**Instructions and Logs**
12   Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

**Bills of Lading**
13 -  (a)     The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35 (a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise

(i)   from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13 (b)) from the master otherwise complying with Charterers' or their agents' orders;

(b)
(i)  at any place other than that shown on the bill of lading and/or
(ii)  without presentation of an original bill of lading

Notwithstanding the foregoing, Owners shall not be obliged to comply with any order from Charterers to discharge all or part of the cargo

unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners.

**Conduct of Vessel's Personnel**
14   If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.

**Bunkers at Delivery Redelivery**
15   Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then current market prices at the port of delivery or redelivery, as the case may be or if such prices are not available, payment shall be at the then current market prices at a port nearest to and at which such prices are available; provided that if delivery or redelivery does not take place at a port, payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the same and to be reimbursed at actual cost including barging/boosting, if any. Notice first in – first out. Cost of bunkers on delivery to be paid together with the first hire.

**Stevedores, Pilots, Tugs**
16   Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company), provided, however, that

(i)  the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and
(ii)  Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, but wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefore from stevedores.

**Supernumeraries**
17   Charterers may send representatives in the vessel's available accommodation not more than 2 persons subject to space being available on the ship upon any voyage made under this charter. Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers paying at the rate of USD 15 payable together with hire per day for each representative while on board the vessel.

**Sub-letting**
18   Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfillment of this charter

118
119
120
121
122
123
124
125
126
127
128
129
130
131
132

133
134
135
136
137
138
139
140
141

142
143
144
145
146
147
148
149
150
151
152
153
154
155

156
157
158
159

160
161
162
163
164
165
166

167

168
169
170
171
172
173
174
175
176
177
178
179

180
181
182

183
184

| | | |
|---|---|---|
| First Voyage | 19   If obtain a payment of hire in due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amount due or reasonably expected to become due for | 185 |
| | | 186 |
| | | 187 |
| | | 188 |
| | (i)   disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and | 189 |
| | | 190 |
| | (ii)   bunkers on board at redelivery pursuant to Clause 15. | 191 |
| | Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers. | 192 |
| | | 193 |
| | If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a | 194 |
| | ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stated herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be | 195 |
| | | 196 |
| | | 197 |
| | | 198 |
| Loss of Vessel | 20   Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss. Should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port | 199 |
| | | 200 |
| | | 201 |
| | | 202 |
| | | 203 |
| | | 204 |
| Off-hire | 21   (a)   On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner) | 205 |
| | | 206 |
| | (i)   due to deficiency of personnel or stores; repairs; gas-freeing for repair purposes and waiting so enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel or any other similar cause preventing the efficient working of the vessel, and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulative to more than three hours (if resulting from partial loss of service), or | 207 |
| | | 208 |
| | | 209 |
| | | 210 |
| | | 211 |
| | | 212 |
| | (ii)   due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or | 213 |
| | | 214 |
| | (iii)   for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or | 215 |
| | | 216 |
| | | 217 |
| | | 218 |
| | (iv)   due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or | 219 |
| | | 220 |
| | | 221 |
| | | 222 |
| | (v)   due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then | 223 |
| | | 224 |
| | | 225 |
| | without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced, provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire | 226 |
| | | 227 |
| | | 228 |
| | | 229 |
| | | 230 |
| | (b)   If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21 (a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between | 231 |
| | | 232 |
| | | 233 |
| | (i)   the time the vessel would have required to perform the relevant service at such guaranteed speed, and | 234 |
| | | 235 |
| | (ii)   the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service). | 236 |
| | | 237 |
| | For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24. | 238 |
| | | 239 |
| | (c)   Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21 (a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound under the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby. | 240 |
| | | 241 |
| | | 242 |
| | | 243 |
| | | 244 |
| | | 245 |
| | | 246 |
| | | 247 |
| | | 248 |
| | | 249 |
| | | 250 |
| | (d)   If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account. | 251 |
| | | 252 |
| | | 253 |
| | | 254 |
| | (e)   Time during which the vessel is off-hire under this charter shall count as part of the charter period. Off-hire during any period to be added at Charterers option and to be declared not later than 40 days prior to the time of redelivery. | 255 |
| | | 256 |
| Periodical | 22   (a)   Owners have the right and obligation to drydock or lay-up for routine maintenance the vessel at regular intervals of | 257 |

| | | |
|---|---|---|
| Drydocking | 12 months | On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than 30 days before such date, and Charterers shall offer a port for such period(s) drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable | 258 259 260 261 |

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received thereof, without prejudice to any claim for loss of cargo under any bill of lading or this charter.

(b) If a periodical drydocking is carried out at the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until dry-docking is completed and she is in every way ready to resume Charterers' service and is in that position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However,

(c) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and

(d) any additional time lost in further gas-freeing to meet the standard required for hot work to enter to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24.

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners' account.

(e) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port.

(f) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tar-barnacling necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.

| | | |
|---|---|---|
| Ship Inspection | 23. | Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage, Owners affording all necessary co-operation and accommodation on board provided, however, | 292 293 294 295 296 |

(i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same, and

(ii) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right

(e) Owners guarantee that the speed and consumption of the vessel shall be as follows:-

| | | Detailed 24 Description and Performance | 302 |
|---|---|---|---|

| Average speed in knots | Sea state description | Maximum average bunker consumption | | |
|---|---|---|---|---|
| | | main propulsion fuel oil/diesel oil tonnes | auxiliaries fuel oil/diesel oil tonnes | 303 304 305 306 |
| Laden Ballast | | | | 307 |

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning and shall be pro-rated between the speeds shown.

The service speed of vessel at ____ knots laden and ____ knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed").

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognized speed"), then for the purpose of calculating any increase or decrease of hire under this Clause 24 the maximum recognized speed shall be used in place of the average speed actually attained.

For the purposes of this charter the "guaranteed speed" at any time shall be the then current ordered speed or the service speed, as the case may be

The average speed and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (a), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds exceed force 8 on the Beaufort Scale for more than 12 hours.

(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls below or exceeds the performance guaranteed in Clause 24 (a) then if such shortfall or excess results

(i) from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24 (a), then an amount equal to the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid;

(ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers

| | | 308 309 310 311 312 313 314 315 316 317 318 319 320 321 322 323 324 325 326 327 328 329 330 331 332 333 |

which would have been consumed had the vessel performed as guaranteed in Clause 24 (a), in amount equivalent | 334
to the value of the additional bunkers consumed as the bunkers saved-as-the-case-may-be, based on the average | 335
price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. | 336
The addition or deduction from hire so calculated for laden and ballast mileage respectively | 337
shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather | 338
Periods, by dividing such addition or deduction by the number of miles over which the performance has been | 339
calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather | 340
Periods, in order to establish the total addition to or deduction from hire to be made for such period | 341
Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other | 342
remedy available to Charterers. | 343

(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each | 344
successive anniversary of the date on which the vessel enters service, and for the period between the last such | 345
anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire | 346
arising under this Clause during the final year or part year of the charter period shall in the first instance be settled | 347
in accordance with Charterers' estimate made two months before the end of the charter period. Any monetary | 348
adjustment after this charter terminates shall be made by payments by Owners to Charterers or by Charterers to | 349
Owners as the case may require. | 350
Payments in respect of increase of hire arising under this Clause shall be made promptly after | 351
receipt by Charterers of all the information necessary to calculate such increase. | 352

**Salvage**     25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to | 353
or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in | 354
successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that | 355
Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of | 356
services rendered under this Clause 25 | 357
All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers | 358
after deducting the master's, officers' and crew's share. | 359

**Lien**     26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts | 360
due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not | 361
earned, and for all claims for damages arising from any breach by Owners of this charter. | 362

**Exceptions**     27.   (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, | 363
be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the | 364
master, pilots, mariners or other servants of Owners in the navigation or management of the vessel, fire, unless | 365
caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, | 366
bursting of boilers; breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, | 367
that Clauses 1,2,3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or | 368
Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage | 369
or delay or failure in performance hereunder arising or resulting from any act, set of war, seizure under legal | 370
process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or | 371
restraint of princes, rulers or people. | 372
(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels | 373
in distress and to deviate for the purpose of saving life or property. | 374
(c) Clause 27 (a) shall not apply to or affect any liability of Owners or the vessel or any other relevant | 375
person in respect of | 376
(i)  loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane | 377
or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, | 378
whether or not such works or equipment belong to Charterers, or | 379
(ii)  any claim (whether brought by Owners or any other person) arising out of any loss of or | 380
damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague | 381
Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill | 382
of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the | 383
Hague-Visby Rules. | 384
(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not | 385
apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. | 386

**Injurious**     28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the | 387
**Cargoes**     foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such | 388
damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that | 389
would expose the vessel to capture or seizure by rulers or governments | 390

**Grade of**     29. Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of   Centistokes at 50 | 391
**Bunkers**     degrees Centigrade/MDO for main propulsion and diesel oil/MDO for the auxiliaries. If Owners require | 392
the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof. | 393
Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality | 394
complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading | 395
company and with its specification for marine fuels as amended from time to time | 396

**Disbursements**     30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents | 397
shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per | 398
cent, and all such advances and commission shall be deducted from hire. | 399

**Laying-up**     31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the | 400
vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be | 401
adjusted to reflect any increases in expenditure reasonably incurred or any net saving which should | 402
reasonably be made by Owners as a result of such lay-up. Charterers may increase the said option any number of | 403
times during the charter period. | 404

**Requisition**     32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this | 405

charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in
respect of such requisition period shall be for Owners' account. Any such requisitioned period shall count as part of
the charter period.

**Outbreak of War**

33. If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R.,
P.R.C., U.K., Netherlands, both Owners and Charterers shall have the right to cancel this Charter. If war or hostilities
break out between any two or more of the following countries: U.S.A., Russia, P.R.C., U.K., Netherlands, South
Africa, Switzerland, any EU country, Korea, Japan, Singapore and the countries of republics having been part of
the former U.S.S.R., except dual declaration of war solely between two or more of the countries or republics having
been part of the former U.S.S.R. shall be exempted both Owners and Charterers shall have the right to cancel this
charter. However, neither party shall be entitled to terminate this Charter Party on account of minor and/or local
war like operations or economic warfare anywhere which will not interfere with vessel's trade.

**Additional War Expenses**

34. If the vessel is ordered to trade in areas where there is war risk then or declared or threat of war
Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which
are reasonably actually incurred by Owners as a consequence of such orders, provided that Charterers are given notice of
such expenses as soon as practicable and in any event before such expenses are incurred, provided that Charterers have
checked with Owners prior ordering the ship to port where additional premium could reasonably be
expected by Charterers to the best of their knowledge and provided further
Owners obtain from these insurers a waiver of any subrogated rights against Charterers in respect of any
claims by Owners under their war risk insurance arising out of compliance with such orders. Charterers is under no
circumstances whatsoever to be liable for any loss, damage or expense which is, or could be, covered by war risks
insurance available commercially.

**War Risks**

35. (a) The master shall not be required or bound to sign bills of lading for any place which in his or
Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade,
war, hostilities, warlike operations, civil war, civil commotions or revolutions.
(b) If in the reasonable opinion of the master of Owners it becomes, for any of the reasons set out in
Clause 35 (a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach
or enter, or to load or discharge cargo at, any place (at which the vessel has been ordered pursuant to this charter
(a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and
Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or
discharged at any other safe place within the trading limits of this charter (provided such other
place is not itself a place of peril). If any place of discharge is to becomes a place of peril, and no orders have been
received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at
liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in
their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due
fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.
(c) The vessel shall have liberty to comply with any directions or recommendations as to departure,
arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other way whatsoever
given by the government of the state under whose flag the vessel sails or any other government or local authority
or by any person or body acting or purporting to act in or with the authority of any such government or local
authority including any de facto government or local authority or by any person or body acting or purporting to
act in or with the authority of any such government or local authority or by any committee or person having under
the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by
reason of or in compliance with any such directions or recommendations anything is done or is not done, such
shall not be deemed a deviation.
If by reason of or in compliance with any such direction or recommendation the vessel does not
proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed
to any place which the master of Owners in his or their discretion select and there discharge the cargo or such part
of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligation under this
charter so far as cargo so discharged is concerned.
Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of
Shipping War Risks Clause 1952.

**Both to Blame Collision Clause**

36. If the liability for any collision in which the vessel is involved while performing this charter falls to be
determined in accordance with the laws of the United States of America, the following provision shall apply:
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any
act, neglect or default in the master, mariner, pilot or the servants of the carrier in the navigation or in the
management of the ship, the Owners of the cargo carried hereunder will indemnify the carrier against all loss, or
liability to the other non-carrying ship or her Owners in so far as such loss or liability represents loss of, or
damage to, or any claim whatsoever of the Owners of the said cargo, paid or payable by the other of non-carrying
ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other or non-carrying
ship or her Owners as part of their claim against the carrying ship or carrier".
"The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship
or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or
contact."
Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the
foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be
determined in accordance with the laws of the United States of America.

**New Jason Clause**

37. General average contributions shall be payable according to the York/Antwerp Rules 1974 as amended in
1990 and 1994 and now called York/Antwerp Rules 1994 and shall
be adjusted in London in accordance with English law and practice but should adjustment be made in accordance
with the law and practice of the United States of America, the following provision shall apply:
"In the event of accident, danger, damage or disaster before or after the commencement of the
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the
consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers,
consignees or Owners of the cargo shall contribute with the carrier in general average to the payment of any

sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay general and
special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said
salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover
the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by
the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the
foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and
practice of the United States of America.

**Clause Paramount**    38. Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the
following clause:

"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject
to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of
Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed
at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be
deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his
responsibilities or liabilities under the Hague-Visby Rules."

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading,
to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules.
Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities
or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if
applicable, such term shall be void to that extent but no further."

"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the
right of any relevant party or person to limit his liability under any available legislation and/or law"

**TOVALOP**    39. ~~Owners warrant that the vessel is—~~
~~(i) a tanker in TOVALOP and~~
~~(ii) properly entered in~~                                                                 ~~P&I Club~~

~~and will so remain during the currency of this charter.~~

~~When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution~~
~~Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the~~
~~escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or~~
~~not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to~~
~~Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution~~
~~Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners~~
~~advised of the nature and result of any such measures taken by them and, if time permits, the nature of the~~
~~measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be~~
~~deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that~~

~~(1) any such activity or discharge prohibited by Charterers—~~
~~(2) any such measure or discharge gave Threat was caused or contributed to by Charterers; or~~

~~(2) by reason of the exceptions set out in Article II, paragraph 2 of the 1969 International~~
~~Convention on Civil Liability for Oil Pollution Damage, Owners are, or had the said Convention applied to such~~
~~escape or discharge as to the Threat, would have been exempt from liability for the same; or~~

~~(3) the cost of such measures together with all other liabilities, costs and expenses of Owners arising~~
~~out of or in connection with such escape or discharge or Threat exceeds one million nine hundred thousand~~
~~Dollars (US $1,900) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States~~
~~Dollars (US $16,800,000), whichever is the lesser, in which case Owners shall be entitled to recover such~~
~~excess which either the 1971 International Convention or the Establishment of an International Fund for~~
~~Compensation for Oil Pollution Damage or an IOPCFUND.~~

~~PROVIDED ALWAYS that if Owners in their absolute discretion consider it necessary~~
~~should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to~~
~~continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this~~
~~Clause 39 shall thereupon cease.~~

~~The above provisions are not in derogation of such other rights as Charterers or Owners may have~~
~~under this charter or may otherwise have or acquire by law or any international Convention or TOVALOP.~~

~~The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability~~
~~for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the~~
~~Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as~~
~~amended from time to time. The terms "Oil", "Pollution Damage", and "Damage" shall for the purposes of this~~
~~Clause 39 have the meanings assigned to them in TOVALOP.~~

**Export Restrictions**    40. The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to
which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was
produced and/or shipped.

Charterers shall procure that all bills of lading issued under this charter shall contain the following
clause

"If any laws, rules or regulations applied by the government of the country in which the cargo was
produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo
to the place of discharge designated in or ordered under the bill of lading, carriers shall be entitled to
require cargo Owners forthwith to nominate an alternative discharge place for the discharge of the
cargo, or such part of it as may be affected, which alternative place shall not be subject to the
prohibition, and carriers shall be entitled to accept orders from cargo Owners to proceed to and
discharge at such alternative place. If cargo Owners fail to nominate an alternative place within 72
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place
on which they or the master may at their or his absolute discretion decide and which is not subject to the
prohibition, and such discharge shall constitute due performance of the contract contained in this bill
of lading so far as the cargo so discharged is concerned"



The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading being deemed to be references to this charter.

**Law and**
**Litigation**

41.  (a)·This charter shall be governed and the relations between the parties determined in accordance with the laws of England.

(b)·Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree.

(a) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force.

(i)  A party shall lose its right to make such an election only if:

(a) it receives from the other party a written notice of dispute which —
(1) states expressly that a dispute has arisen out of this charter;
(2) specifies the nature of the dispute and
(3) refers expressly to this clause 41 (ii)

— and

(b) ———it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute.

(ii) The parties hereby agree that either party may —
(a) appeal to the High Court on any question of law arising out of an award;
(b) apply to the High Court for an order that the arbitrator state the reasons for his award;
(c) give notice to the arbitrator that a reasoned award is required; and
(d) apply to the High Court to determine any question of law arising in the course of the reference.

(d) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which the other party may seek to enforce, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security in which that other party would have been entitled to seek such legal proceedings in the absence of a stay. This contract shall be covered by and construed in accordance with English Law and any dispute arising out of or in connection with this Contract shall be referred to Arbitration in London under the LMAA terms current at the time when the Arbitration proceedings are commenced. Each party shall appoint one arbitrator.

A party wishing to refer a dispute to Arbitration shall appoint its arbitrator and send Notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that Notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and give Notice that it has done so within the 14 days specified.

If the non arbitrators is properly appointed by the parties their award give they shall appoint an umpire whose decision shall be final. The award of the Arbitrator or the umpire shall be final and binding upon both parties.

If the other party does not appoint its own arbitrator and give Notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its own arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

**Construction**

42. The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.

ADDITIONAL CLAUSES:
—————————————

1)  MAJOR OIL COMPANY CSS

OWNERS UNDERTAKE TO USE THEIR BEST ENDEAVOURS TO ENSURE THAT VESSEL WILL NOT BE TECHNICALLY UNACCEPTABLE TO MINIMUM 3 OF FOLLOWING OIL MAJORS STATOIL/EXXONMOBIL/CHEVEX/SHELL/BP/TOTALFINASLF DURING THE TIME CHARTER PERIOD AND THERE SHOULD ALWAYS BE A SIRE REPORT LESS THAN 6 MONTHS OLD FROM LAST INSPECTION DATE SUBJECT TO TRADING PATTERN AND INSPECTOR AVAILABILITY AND THE OIL MAJOR BEING WILLING TO INSPECT THE SHIP AT THE TIME REQUESTED.

CHARTERERS SHALL HAVE THE RIGHT TO ARRANGE FOR INSPECTION OF THE VESSEL, ALWAYS WITHIN THE SCOPE OF OCIMF STANDARDS, AT ANY TIME THROUGHOUT THE PERIOD OF THIS CHARTER FOR THEIR ACCOUNT AND WITHOUT INTERRUPTION OF VESSEL'S NORMAL TURNAROUND. IF OWNERS HAVE ALREADY ARRANGED FOR INSPECTION AT SAME PORT AS CHARTERERS REQUEST THEN OWNERS INSPECTION TO HAVE PRIORITY.

IN CASE MAJOR DEFICIENCIES ARE FOUND DURING THIS OR OTHER OCIMF/SIRE INSPECTION WHICH INDICATE THAT THE VESSEL DOES NOT MEET OCIMF MINIMUM STANDARD SAFETY REQUIREMENTS, THESE MAJOR DEFICIENCIES MUST BE ATTENDED/REPAIRED WITHIN NEXT 30 DAYS AFTER SUCH NOTICE OTHERWISE CHARTERERS CAN PLACE VESSEL OFFHIRE. IF DEFICIENCIES NOT RECTIFIED AFTER ADDITIONAL 30 DAYS CHARTERERS TO HAVE THE RIGHT TO CANCEL THIS CHARTER PARTY.

2) BILL OF LADING/LOI CLS

OWNERS AGREE TO RELEASE CARGO AT DISCHARGING PORT WITHOUT PRODUCTION
OF BILLS OF LADING OR CHANGE OF DESTINATION AGAINST CHARTERERS LETTER OF
INDEMNITY WHICH WORDING SHALL BE IN ACCORDANCE WITH OWNERS PANDI CLUB
(STANDARD FORM) WITHOUT BANK GUARANTEE. THE LETTER OF INDEMNITY IS
ATTACHED TO THIS CHARTERPARTY AND CAN BE INVOKED BY THE CHARTERERS AT ANY TIME.

3) ITF CLS

OWNERS WARRANT THAT THE VESSEL SHALL THROUGHOUT THE ENTIRE PERIOD
DURATION OF THIS CHARTER HAVE ON BOARD:
- A CREW WHICH BELONGS TO A UNION RECOGNISED BY AND AFFILIATED TO ITF AND
- AN ITF CERTIFICATE OR EQUIVALENT ALLOWING VESSEL'S CALL AND
OPERATIONS IN ALL PORTS WITHIN THE C/P TRADE WHERE AN ITF CERTIFICATE IS
COMPULSORY AND REQUIRED.

4) DISCHARGE PERFORMANCE CLS

OWNERS WARRANT VESSEL ABLE DISCHARGE ENTIRE HOMOGENEOUS CARGO WITHIN 24
HOURS OR MAINTAIN 100 PSI AT SHIP'S RAILS PROVIDED SHORE FACILITIES PERMIT
AND VSL IS ALLOWED TO USE FULL PUMPING CAPACITY, PROVIDED CARGO HAS SUCH
VISCOSITY THAT IT GIVES FREE FLOAT TO VSL'S PUMPS AS VERIFIED BY TWO
INDEPENDENT SURVEYORS ONE NOMINATED AND PAID BY OWNERS AND ANOTHER BY
CHRTRS.
SUCH PUMPING WARRANTY ALWAYS TO EXCLUDE STRIPPING.

5) IWL CLS

IN CHARTERERS OPTION TO REQUEST THE VESSEL TO BREACH IWL LIMITS,
ALWAYS SUBJECT TO OWNERS PERMISSION WHICH SHOULD NOT BE UNREASONABLY
WITHHELD. ANY EXTRA INSURANCE AND/OR CHARGES INCURRED BY BREACHING
IWL TO BE FOR CHRTRS ACCT.
VESSEL NOT TO NAVIGATE IN ICE.

6) WARRANTY

OWNERS GUARANTEE THAT THE VESSEL IS NOT PRECLUDED FROM DUE AND
NORMALPERFORMANCE UNDER THIS CHARTER PARTY BY VIRTUE OF PREVIOUS
TRADING.

7) ELIGIBILITY AND COMPLIANCE CLAUSE

OWNERS WARRANT THAT THE VESSEL IS IN ALL RESPECTS ELIGIBLE UNDER
APPLICABLE CONVENTIONS, LAWS AND REGULATIONS FOR TRADING TO THE PORTS
AND PLACES SPECIFIED IN THIS CP AND SHALL HAVE ON BOARD, OR OBTAIN FOR
INSPECTION BY THE APPROPRIATE AUTHORITIES ALL CERTIFICATES, RECORDS,
COMPLIANCE LETTERS, CONTINGENCY PLANS AND OTHER DOCUMENTS REQUIRED FOR
SUCH SERVICES, INCLUDING, BUT NOT LIMITED TO CERTIFICATES OF FINANCIAL
RESPONSIBILITY FOR OIL POLLUTION, IE. DURING THE C/P THE VESSEL CALLS USA
AND/OR IT'S TERRITORIES THEN TIME AWAITING USCG INSPECTION IS FOR
CHARTERERS ACCOUNT, BUT MAX 24 HOURS.

WITHOUT LIMITATION, THE CONVENTIONS, LAWS, REGULATIONS AND REQUIREMENTS
REFERRED TO MEAN CONVENTIONS, LAWS, REGULATIONS AND REQUIREMENTS CONCERNING
SHIP SIZE, SHIP DESIGN, SAFETY, OPERATION OF SHIPS EQUIPMENT (INCLUDING INERT
GAS AND CRUDE OIL WASHING SYSTEMS, IF THE VESSEL IS SO EQUIPPED) NAVIGATION,
POLLUTION AND OTHER LIKE MATTERS.

OWNER FURTHER WARRANTS THAT THE VESSEL DOES, AND WILL, FULLY COMPLY
WITH ALL APPLICABLE CONVENTIONS, LAWS, REGULATIONS AND ORDINANCES OF ANY
INTERNATIONAL, NATIONAL STATE OR LOCAL GOVERNMENTAL ENTITY HAVING
JURISDICTION.
ANY DELAYS, LOSSES, EXPENSES OR DAMAGES ARISING AS A RESULT OF FAILURE

TO COMPLY WITH THIS CLAUSE SHALL BE FOR OWNER'S ACCOUNT.

IN THE INTEREST OF SAFETY, OWNERS WILL RECOMMEND THAT THE MASTER OBSERVE THE RECOMMENDATIONS AS TO TRAFFIC SEPARATION AND ROUTING WHICH ARE ISSUED FROM TIME TO TIME BY THE INTERNATIONAL MARITIME ORGANISATION IMO/OR AS PROMULGATED BY THE STATE OF THE FLAG OF THE VESSEL OR THE STATE IN WHICH THE EFFECTIVE MANAGEMENT OF THE VESSEL IS EXERCISED.

8) CLOSED LOADING SYSTEM CLS

OWNERS WARRANT THAT VESSEL IS EQUIPPED WITH A WORKING CLOSED LOADING SYSTEM AND WILL SO REMAIN THROUGHOUT THE TIMECHARTER PERIOD.

9) OCIMF CLS

OWNER WARRANT THE VESSEL IS EQUIPPED TO OIL COMPANY INTERNATIONAL MARINE FORUM STANDARDS RELATING TO :
- STANDARDS FOR OILTANKER MANIFOLD AND ASSOCIATED EQUIPMENT LATEST EDITION
- SHIP TO SHIP TRANSFER PETROLEUM GUIDE LATEST EDITION AND ANY AMENDMENTS THERETO

10) PANDI/LTOPF CLAUSE

OWNERS WARRANT THAT THE VESSEL IS:

A)  PROPERLY ENTERED IN A P AND I CLUB WITHIN THE INTERNATIONAL GROUP OF P AND I CLUBS AND WILL REMAIN SO DURING THE PERIOD OF THIS CHARTER. THE VESSEL AT TIME OF DELIVERY IS ENTERED WITH THE UK PandI Club.

B)  OWNERS WARRANT THAT THEY HAVE IN PLACE INSURANCE COVERAGE FOR OIL POLLUTION FOR THE MAX LIMITS (PRESENTLY USD 1.0 BILLION) ON OFFER THROUGH THE INTERNATIONAL GROUP OF PANDI CLUBS AND THAT COVER WILL REMAIN IN PLACE THROUGHOUT THE PERIOD OF THIS CHARTER.

C)  OWNED BY A MEMBER OF THE INTERNATIONAL TANKER OWNERS POLLUTION FEDERATION LIMITED AND WILL SO REMAIN THROUGHOUT THE PERIOD OF THIS CHARTER.

11) HULL AND MACHINERY

OWNERS WARRANT THAT THEY HAVE IN FULL FORCE AND EFFECT HULL AND MACHINERY INSURANCE PLACED TO MARKET MSHI (Marine Shipping Mutual Insurance) THROUGH REPUTABLE BROKERS Willis Limited FOR THE Hull Value OF USD9,400,000 AND I.V. OF USD2,350,000  SUCH INSURANCE TO BE MAINTAINED FOR THE DURATION OF THIS CHARTER. INSURANCE FOR BLOCKING AND TRAPPING, IF ANY, ALWAYS TO BE FOR OWNERS' ACCOUNT. ALL REDUCTIONS / DISCOUNTS OBTAINED BY OWNERS FOR THE INSURANCE FOR WHICH CHARTERERS ARE ACCOUNTABLE TO BE PASSED ONTO CHARTERERS.

OWNERS SHALL GIVE TO CHARTERERS, WHEN CHARTERERS SO REQUEST, THE EVIDENCE OF THE INSURANCE AND THE INSURED VALUE OF THE VESSEL. OWNERS SHALL BE RESPONSIBLE FOR ANY LOSS OR DAMAGES CHARTERERS MAY INCUR BECAUSE OF OWNERS' FAILURE TO COMPLY WITH THE PROVISIONS OF THIS CLAUSE.

12) HEATING CLS

OWNERS WARRANT THAT THE VESSEL IS IN ALL RESPECTS ABLE TO MAINTAIN LOADED TEMPERATURE OF CARGO OR INCREASE LOADED TEMPERATURE DURING THE VOYAGE, HOWEVER UPTO MAX 135 DEG F AND ALWAYS PROVIDED LENGTH OF THE VOYAGE PERMITS.
MAX LOADING TEMPERATURE 165 DEG F.

13) CIVIL LIABILITY CONVENTION CLS

OWNERS WARRANT VESSEL CARRY ONBOARD A ORIGINAL VALID CLC CERTIFICATE THROUGHOUT THE TIME CHARTER PARTY PERIOD.

14) RETENTION / SMUGGLING CLS

SHOULD THE VESSEL BE SEIZED OR DETAINED BY ANY AUTHORITY, OR ARRESTED AT THE SUIT OF ANY PART HAVING OR PURPORTING TO HAVE A CLAIM AGAINST ANY INTEREST IN THE VESSEL BORNE BY THE ORIGINAL OWNERS, HIRE SHALL NOT BE PAYABLE IN RESPECT OF ANY PERIOD DURING WHICH THE VESSEL IS NOT AT CHARTERERS USE AND ALL EXTRA EXPENSES SHALL BE FOR OWNERS' ACCOUNT.

ANY DELAY, EXPENSES AND/OR FINES INCURRED ON THE ACCOUNT OF SMUGGLING TO BE FOR OWNER'S ACCOUNT IF CAUSED BY MASTER, OFFICERS, CREW OR OWNERS' SERVANTS.

15) ISPS/AMS

 BIMCO ISPS AND AMS CLAUSES TO BE INCORPORATED IN THIS C/P

16) CARGO RETENTION CLS

IN THE EVENT THAT ANY CARGO IN EXCESS OF 0.3% REMAINS ONBOARD UPON COMPLETION OF DISCHARGE, CHARTERERS SHALL HAVE THE RIGHT TO CLAIM FROM OWNERS AN AMOUNT EQUAL TO THE FOB PORT OF LOADING VALUE OF SUCH CARGO PLUS FREIGHT AND INSURANCE DUE WITH RESPECT THERETO, PROVIDED THAT THE VOLUME OF CARGO REMAINING ONBOARD IS LIQUID AND PUMPABLE AND REACHABLE BY VESSEL EQUIPMENT AS DETERMINED BY INDEPENDENT INSPECTOR.

17) IN-TRANSIT LOSS CLS

IN ADDITION TO ANY OTHER RIGHTS WHICH CHARTERERS MAY HAVE, OWNERS WILL BE RESPONSIBLE FOR THE FULL AMOUNT OF ANY IN-TRANSIT LOSS IF IN-TRANSIT LOSS EXCEEDS 0.5 PERCENT AND CHARTERERS SHALL HAVE THE RIGHT TO DEDUCT FROM HIRE AN AMOUNT EQUAL TO THE FOB PORT OF LOADING VALUE OF SUCH LOST CARGO PLUS FREIGHT AND INSURANCE DUE WITH RESPECT THERETO. IN-TRANSIT LOSS IS DEFINED AS THE DIFFERENCE BETWEEN NET VESSEL VOLUMES AFTER LOADING AT THE LOADING PORT AND BEFORE UNLOADING AT THE DISCHARGING PORT.

18) OFF-HIRE CONSUMPTION CLAUSE

IN THE EVENT OF ANY OFF-HIRES ARISING FROM ANY MATTER ALL BUNKERS USED BY THE VESSEL DURING SUCH PERIODS SHALL BE FOR OWNERS ACCOUNT.

19) SUPERCARGO SURVEYOR CLAUSE

CHARTERERS SHALL HAVE THE RIGHT TO PLACE ONBOARD, AT THEIR COST AND RISK, A SUPERCARGO TO SURVEY CLEANING AND/OR LOAD/DISCHARGE OPERATIONS.

20) DOCUMENTATION

UPON CHARTERERS WRITTEN REQUEST OWNERS SHALL SOONEST POSSIBLE PROVIDE CHARTERERS WITH COPIES OF VESSEL'S PLANS, CERTIFICATES, INSURANCE POLICIES AND OTHER DOCUMENTATION AS MAY BE REASONABLY REQUIRED FOR COMMERCIAL PURPOSES.

21) MULTIGRADE TRADE

OWNERS WARRANT THAT ON THE DATE OF COMMENCEMENT AND THROUGHOUT THE DURATION OF THIS CHARTER THE VESSEL SHALL BE IN EVERY WAY FIT TO LOAD/CARRY/DISCHARGE MULTIPLE GRADES OF CARGOES IN ACCORDANCE WITH ISGOTT REQUIREMENTS AND CHARTERERS' CARGO HANDLING INSTRUCTIONS.

IT IS CLEARLY UNDERSTOOD BETWEEN CHARTERERS/OWNERS THAT ALL
LOADING/DISCHARGING INSTRUCTIONS ETC. RECEIVED FROM CHARTERERS ARE TO BE
CAREFULLY ANALYZED BY MASTER/OFFICERS AND IF MASTER/OFFICERS HAVE ANY
OBJECTIONS TO INSTRUCTIONS RECEIVED, MASTER IS TO CONTACT CHARTERERS
IMMEDIATELY IN ORDER TO CLARIFY ORDERS RECEIVED.

THE OWNERS SHALL EXERCISE DUE DILIGENCE TO MAINTAIN IN GOOD CONDITION
ALL PARTS AND SURFACES COMING IN CONTACT WITH THE CARGOES AND SHALL
REPAIR AT FIRST OPPORTUNITY ALL CRACKS, DEFECTS AND DAMAGES TO THE
COATING,
BULKHEADS, CARGO PIPES AND OTHER CARGO-HANDLING /SERVICING EQUIPMENT,
INCLUDING NORMAL WEAR AND TEAR, AS MUCH AS CAN BE RECOGNISED/DETERMINED.

FROM THE DATE OF DELIVERY AND THROUGHOUT THE DURATION OF THIS CHARTER
MASTER/OWNERS SHALL KEEP ACCURATE RECORDS OF CARGO HISTORY, INCLUDING
WIBE/ETBE CONTENT TO THE EXTENT IT IS POSSIBLE. UPON REQUEST FROM
CHARTERERS MASTER SHALL PROMPTLY PROVIDE THE LATTER WITH CARGO HISTORY
STATEMENT SHOWING LAST 3 CARGOES IN ALL TANKS, INCLUDING SLOP TANKS.


22) TANK CLEANING CLS.

OWNERS TO BE FULLY RESPONSIBLE FOR ANY TANK CLEANING HARING USE OF
VESSEL'S CREW AND EQUIPMENT IN ACCORDANCE WITH CHARTERERS CLEANING
INSTRUCTIONS (WHICH IS TO BE INFORMATION ABOUT NEXT CARGO(ES)). ANY
CHEMICALS USED TO BE FOR CHARTERERS ACCOUNT. HOWEVER TIME, BUNKERS AND
CONSUMPTION OF CLEANING CHEMICALS NOT TO EXCEED INDUSTRY STANDARDS.


23) ISM CLAUSE.

FROM DATE OF COMING INTO FORCE OF INTERNATIONAL SAFETY MANAGEMENT
(ISM)CODE IN RELATION TO THE VESSEL AND THEREAFTER DURING THE CURRENCY
OF THIS CHARTER PARTY, THE OWNERS SHALL PROCURE THAT BOTH THE VSL AND 'THE
COMPANY' (AS DEFINED BY THE ISM CODE) SHALL COMPLY WITH THE REQUIREMENTS OF
ISM CODE. UPON REQUEST OWNERS SHALL PROVIDE A COPY OF RELEVANT DOCUMENT OF
COMPLIANCE (DOC) AND SAFETY MANAGEMENT CERTIFICATE (SMC) TO THE CHRTRS.


24) REDELIVERY NOTICES
CHRTRS TO GIVE 40/30/15/10 DAYS APPROX AND 7/5/3/1 DAY DEFINITE NOTICES
ON REDELIVERY.

25) EXTRA WAR RISKS CLAUSE - DELETED

26) BUNKER FUEL SULFHUR CONTENT CLAUSE (SINCO)

(A) WITHOUT PREJUDICE TO ANYTHING ELSE CONTAINED IN THIS CHARTER
PARTY, THE CHARTERERS SHALL SUPPLY FUELS OF SUCH SPECIFICATIONS AND GRADES TO
PERMIT THE VESSEL, AT ALL TIMES, TO COMPLY WITH THE MAXIMUM SULPHUR
CONTENT REQUIREMENTS OF ANY EMISSION CONTROL ZONE WHEN THE VESSEL IS
ORDERED TO TRADE WITHIN THAT ZONE.

THE CHARTERERS ALSO WARRANT THAT ANY BUNKER SUPPLIERS, BUNKER CRAFT
OPERATORS AND BUNKER SURVEYORS USED BY THE CHARTERERS TO SUPPLY SUCH
FUELS SHALL COMPLY WITH REGULATIONS 14 AND 18 OF MARPOL ANNEX VI,
INCLUDING THE GUIDELINES IN RESPECT OF SAMPLING AND THE PROVISION OF
BUNKER DELIVERY NOTES.

THE CHARTERERS SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE OWNERS IN
RESPECT OF ANY LOSS, LIABILITY, DELAY, FINES, COSTS OR EXPENSES
ARISING OR RESULTING FROM THE CHARTERERS' FAILURE TO COMPLY WITH THIS
SUB-CLAUSE (A).

(B) PROVIDED ALWAYS THAT THE CHARTERERS HAVE FULFILLED THEIR
OBLIGATIONS IN RESPECT OF THE SUPPLY OF FUELS IN ACCORDANCE WITH
SUB-CLAUSE (A), THE OWNERS WARRANT THAT:

(I) THE VESSEL SHALL COMPLY WITH REGULATIONS 14 AND 18 OF MARPOL ANNEX
VI AND WITH THE REQUIREMENTS OF ANY EMISSION CONTROL ZONE; AND
(II) THE VESSEL SHALL BE ABLE TO CONSUME FUELS OF THE REQUIRED SULPHUR
CONTENT WHEN ORDERED BY THE CHARTERERS TO TRADE WITHIN ANY SUCH ZONE.

SUBJECT TO HAVING SUPPLIED THE VESSEL WITH FUELS IN ACCORDANCE WITH
SUB-CLAUSE (A), THE CHARTERERS SHALL NOT OTHERWISE BE LIABLE FOR ANY
LOSS, DELAY, FINES, COSTS OR EXPENSES ARISING OR RESULTING FROM THE
VESSEL'S FAILURE TO COMPLY WITH REGULATIONS 14 AND 18 OF MARPOL ANNEX
VI.

(C) FOR THE PURPOSE OF THIS CLAUSE, "EMISSION CONTROL ZONE" SHALL MEAN
ZONES AS STIPULATED IN MARPOL ANNEX VI AND/OR ZONES REGULATED BY
REGIONAL AND/OR NATIONAL AUTHORITIES SUCH AS, BUT NOT LIMITED TO, THE
EU AND THE US ENVIRONMENTAL PROTECTION AGENCY.

27) REMEASUREMENT

CHARTERERS SHALL HAVE THE OPTION OF REMEASURING THE VESSEL TO A LOWER
DEADWEIGHT TONNAGE AT ANY TIME DURING THE TERM OF THIS CHARTER-PARTY
AND ANY EXTENTION THERETO. TIME AND COST OF REMEASUREMENT TO A LOWER
DEADWEIGHT AND SUBSEQUENT REMEASUREMENT TO ORIGINAL CHARTER-PARTY SUMMER
DEADWEIGHT SHALL BE FOR CHARTERERS' ACCOUNT BUT OWNER AGREES TO CONDUCT
SUCH REMEASUREMENT EXPEDITIOUSLY.

28) CHARTER PARTY ADMINISTRATION CLAUSE

CHARTER PARTY TERMS AND CONDITIONS ARE EVIDENCED BY THE FIXING
CONFIRMATION TELEX/FAX/E-MAIL. EXCEPT IF REQUESTED IN WRITING BY EITHER
OWNERS OR CHARTERERS, THERE SHALL BE NOT PRODUCED FORMAL WRITTEN AND
SIGNED CHARTER PARTY. BOTH OWNERS AND CHARTERERS SHALL CONFIRM RECAP
AS EVIDENCE OF THE FIXTURE.

29) OWNERS SPECIAL CLAUSE

Owners have the right, subject to charterers prior approval which not to be
unreasonably withheld, to sell the ship or change ship management company
during the course of the charter. In the event owners exercising the right of
sale, charterers shall be given right of 1st refusal.

30) CHARTERERS SPECIAL CLAUSE

ANY DOCUMENT(S) (INCLUDING copies of VESSEL CERTIFICATES) REQUIRED BY CHARTERERS TO
OBTAIN NIGERIAN FLAG WAIVER, NATIONAL MARITIME AUTHORITY APPROVAL, NIGERIAN
CERTIFICATE OF COMPLIANCE SHALL BE MADE AVAILABLE TO
CHARTERERS WITHOUT UNDUE DELAY.

Clause 31) Purchase Option Clause

Charterers shall at the end of 3 years charter period have the option to
purchase the vessel at a price of US$9,300,000.00. (nine million three hundred
thousand United States Dollars) SUCH OPTION TO BE DECLARED 60 DAYS PRIOR TO
END OF 3 YEAR CHARTER PERIOD. (IF, DURING THE COURSE OF THE CHARTER, OWNER
EXERCISE'S ITS RIGHTS TO SELL THE VESSEL, CHARTERERS HAVE RIGHT OF 1ST REFUSAL
AS PER CLAUSE 29)

32. COMMISSIONS

FOR THE CHARTER: 3.75 PCT TOTAL
1.25 PCT FOR ENERGY FACTOR MARINE AND OIL SERVICES LTD
1.25 PCT FOR SEA AGENCY JSC
1.25 PCT FOR ASM, MONACO

ON CHARTERERS DECLARATION OF THE PURCHASE OPTION: 3 PCT TOTAL
1.0 PCT FOR ENERGY FACTOR MARINE AND OIL SERVICES LTD
1.0 PCT FOR SEA AGENCY JSC
1.0 PCT FOR ASM, MONACO

THE OWNERS

*H.W.Scheff*

H.W. SCHEFFER

UNICORN TANKERS (INTERNATIONAL) LIMITED

31/12/2007

THE CHARTERERS

BAWO ETIKERENTSE
MANAGING DIRECTOR

Disclaimer
This Charter Party is a computer generated copy of SHELLTIME 4 form, using software which is the copyright of Matakina Brokerage Inc. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author. The Author, Licensor and the End User assume no responsibility for any loss or damage caused as a result of discrepancies and/or typographical errors between the original SHELLTIME 4 form and this computer generated copy.